O'Toole *v.* Dunmore Borough, Appellant.

480

Argued April 20, 1961. Before Jones, C. J., Musmanno, Jones, Cohen, Bok and Eagen, JJ.

*Joseph E. Gallagher,* with him *William J. Kearney, Carlon M. O'Malley, Sr.,* and *O'Malley, Morgan, Bour & Gallagher,* for appellant.

*Jerome E. Parker,* with him *John M. Kelly,* and *John J. Scott,* for appellee.

Opinion by Mr. Justice Musmanno, July 17, 1961:

On the afternoon of January 7, 1957, the plaintiff in this case, Paul F. O'Toole, left his home at 402 Ward Street, Dunmore, on a perfectly wholesome and harmless errand—to purchase a loaf of bread, which his wife needed for the evening meal. He returned an hour or two later without the bread and, in addition, a fractured hip. His innocent but disastrous venture was

followed by hospitalization, surgery, crutches, cane, a long convalescence, a limp, considerable expenditure of funds and impairment of earning power. He brought suit in trespass against the Borough of Dunmore as the party responsible for his misfortune.

Specifically he asserted that after he had purchased the bread (with some ice cream as an added delicacy), he started for his car parked close to the grocery store, but that as he reached the intersection of Throop and Boyle Streets, his feet flew out from under him, and then as he lay helpless where he fell he saw for the first time the cause of his mishap—a hole in the sidewalk which had been concealed from his eyes by the curtain of snow which was falling. He noted that the hole was about "2 feet in diameter," by "3 to 4 inches deep," and that ice had encrusted within, its upper plane being about one-half inch from the surface of the sidewalk.

The borough denied the liability charged by the plaintiff. At the ensuing trial the jury returned a money verdict in favor of the plaintiff and the defendant moved for judgment n.o.v., as well as a new trial. When the lower court affirmed the verdict, the defendant appealed.

This case presents a rather unusual factual situation in that the defendant contends that the plaintiff's story of the bread-procuring expedition which ended in bone-breaking catastrophe is sheer fiction; and that the plaintiff is endeavoring to have the borough pay for the plaintiff's self-achieved folly when he fell, not on the street, but on his own premises. In support of this accusation, the defendant produced an employee of the Scranton Fire Department, who testified that as he rode in the ambulance which transported the plaintiff to the hospital, the plaintiff stated that he slipped on the front porch of his home.

The defendant followed up this accusation with evidence intended to show that there was no defect in the

pavement at the corner of Throop and Boyle streets. Specifically, that the intersection had been paved in 1953, also that in 1954 Boyle Street had been paved at the point where it adjoined the part which had been paved in 1953, and that photographs taken in the fall of 1959 of the area where the plaintiff claimed to have fallen disclosed that the crosswalk and the street intersection were in perfect condition, without any semblance of defect or irregularity.

To bolster this argumentation the defendant called a paving engineer who was connected with the contractor who had paved the intersection in 1953. This witness testified that he examined the intersection and crosswalk in January 1959, found no evidence of repair and that it was in as good condition as it was 6 years before when the paving was done. The defendant also called a construction contractor, a civil engineer, a street commissioner, a blacktop foreman, and a general borough foreman who collectively testified that from personal observation and study of the pavement, it could not have been in the condition described by the plaintiff and his witnesses in January, 1957.

But of what avail is it to argue theoretically that a dam can not break when one has before his very eyes the physical evidence of the collapse in the dike and the resulting devastating flood?

It is to be noted that it wasn't the plaintiff alone who testified to the unsafe conditions at Throop and Boyle. G. F. Kays, the man who picked up O'Toole at this point and took him home testified that the cavity in the pavement here was 3 to 4 inches deep and that "it was more or less a jagged hole with part of the black top probably broke off and went in the hole, and this ice was over the pieces of black top that was in there, it was uneven."

Another witness, J. R. O'Hara, testified that he saw not one, but several holes in the sidewalk at Throop and

Boyle. Also, that the sidewalk was repaired in the *Spring* of 1957, that is, after O'Toole's accident, and before the taking of the photographs in the *fall* of 1957. Still another witness, J. O. Sample, testified that the hole in question was 2 to 3 inches deep and that "there was ice in it, as though water ran in and froze over."

To accept the defendant's theory of O'Toole's mishap we must assume that after O'Toole fell on his front porch he made his way, in some mysterious fashion, while suffering from a fragmentized hip bone, to the corner of Throop and Boyle Streets where he lay down in the snow and ice to await some kind-hearted and strong-muscled passerby to pick him up (he weighed 218 pounds) and take him back to his home again.

The verdict would suggest that the jury regarded this daring theory as an assault on credulity which they were required to determinedly repulse.

The jury was undoubtedly impressed by the fact that O'Toole's helpless sprawl at Throop and Boyle was attested to not only by Gerald Kays, the motorist Samaritan who picked him up and managed to get him into his car, but also by H. L. Kessler the grocer at whose store the plaintiff purchased the bread and the ice cream which never reached his family's table. And then there was, in addition, the witness James J. Sample who saw O'Toole being taken to his home in Kays' car from the area of the asserted fall on the wintry street.

The defendant argues that it is entitled to a new trial on the basis that the verdict was against the weight of the evidence, submitting in its brief that "Considering the stature and experience of defendant's witnesses . . ., there would appear to be no other conclusion to draw except that no repairs had been made to the crosswalk subsequent to the time plaintiff claimed he sustained his accident."

But the stature of witnesses is something to be gauged by the jury, and there is nothing in the record

to show that the tape measure of credibility in their hands was faulty or unreliable.

Then the defendant argues: "If no repairs were made and the photographs depict a smooth surface, at least in the fall of 1957, and certainly in November of 1957, then the crosswalk in January of 1957 must have been equally smooth." But this begs the question. There *was* evidence that repairs were made after the accident and before the photographs were taken.

The defendant says that the fact that the jury rejected its evidence and rendered a verdict for the plaintiff "is indicative it was influenced by some extraneous factor." But to say that the jury was influenced by "some extraneous factor," in the absence of any proof of such extraneousness is another theory which must ride in the same phantom vehicle which transported the plaintiff from his home to the shell holes of Throop and Boyle Streets.

The appellant urges that if the crosswalk was as deteriorated as the plaintiff and his witnesses described, the plaintiff was then guilty of contributory negligence. But this certainly was a question of fact for determination of the jury. The jury could reasonably have found verisimilitude in the plaintiff's explanation that snow hid from his eyes the defect in the pavement which threw him.

Nor can we accept the defendant's assertion that the plaintiff "conceded that he was not looking as he walked across the street." The plaintiff said that he was not looking down at the ground at his feet as he was crossing the intersection. This is not quite the same as saying he was not looking where he was going. The law does not require a pedestrian, pursuing his care-filled way, to keep his eyes glued to the pavement over which he walks, as if he were looking for lost gold pieces.

Our Superior Court well stated in *Ford v. Phila.*, 45 Pa. Superior Ct. 404: "In Robb v. Connellsville Bor-

ough, 137 Pa. 42, a leading case, it is said that the reasonable care which the law exacts of all persons, in whatever they do involving the risk of injury, requires travelers on the footways of public streets to look where they are going. This is imperative; but, as was said in that case, as well as others since, this does not necessarily imply that the pedestrian must keep his eyes constantly and at every moment upon the pavement. The thought is clearly expressed in the late case of Lerner v. Philadelphia, 221 Pa. 294: 'One is not required in walking along a traveled highway, to keep his eyes fastened upon the ground continually to discover points of possible danger; nor is it necessary that he should in order to avoid exposed pitfalls lying directly in the path before him; but the law does require that he be observant of where and how he is going so as to avoid dangers which ordinary prudence would disclose.' . . . Whether or not the plaintiff knew or ought to have known beforehand of the existence of the hole, and, if not, whether the conditions were such that ordinary prudence required her to look down to the pavement at her feet, and, if she had done so, whether she would have seen the dangerous condition, were questions for the jury."

And then, even if the plaintiff had been aware of the defective condition of the roadway at the telltale intersection, this in itself, would not make him guilty of contributory negligence *as a matter of law.* We stated in *Steck v. City of Allegheny,* 213 Pa. 573: "Persons are not necessarily prohibited from using a street of a city because it is defective or may be partly obstructed. If this were so, business would be unnecessarily retarded and people would be greatly incommoded in the pursuit of their daily avocations . . . when the testimony shows a defect of such character that the street can be used with safety by the exercise of reasonable care notwith-

standing its defective condition, it is not for the court, but for the jury, to determine whether the injured party performed the duty required of him under the circumstances. In 15 Am. & Eng. Ency. of Law (2d ed.), 468, it is said, citing numerous decisions of many states, including our own, in support of the rule, that 'it is generally agreed that a traveler's previous knowledge of a defect in the highway whereby he is injured is not of itself sufficient, as a matter of law, to prevent his recovery on the ground of contributory negligence.' In Stokes v. Ralpho Township, 187 Pa. 333, we held that one is not precluded from recovering for an injury received from a defect in a road, though knowing it was defective, unless the danger was so apparent that in the use of ordinary care he ought not to have undertaken the passage."

The other arguments in the appellant's brief, ably and excellently presented as they are, do not establish that the lower court was in error in sustaining the jury's verdict. The assertion that the instructions to the jury were "incomplete" find no support in the record.

The issues in this case were strictly factual and we are satisfied that, under the proper guidance of the trial court, and through the able handling of the case by the attorneys on both sides, those issues were resolved by the jury in accordance with established law.

Judgment affirmed.

Mr. Justice BENJAMIN R. JONES and Mr. Justice BOK concur in the result.

Mr. Justice COHEN dissents.